UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 7 |
| Barry Mark Schwartz, | Case No. 12-66764 |
| Debtor. / | Hon. Phillip J. Shefferly |
| Daniel M. McDermott, United States Trustee, | Adversary Proceeding No. 13-4622-PJS |
| Plaintiff, | |
| v. | |
| Barry Mark Schwartz, | |
| Defendant. / | |

**OPINION DENYING CHAPTER 7 DISCHARGE**

### Introduction

This matter is before the Court on a complaint against the Debtor, Barry Mark Schwartz ("Debtor"), objecting to his discharge under § 727(a)(2)(A) and § 727(a)(4)(A) of the Bankruptcy Code. The Court held a trial on February 25, 2015 and took the matter under advisement. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. After carefully weighing all of the evidence received at trial, the Court concludes, for the reasons set forth in this opinion, that the Debtor's discharge must be denied.

### Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(J), over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and § 157(a).

## Procedural History

On December 10, 2012, the Debtor filed this Chapter 7 case. At the time, the Debtor was represented by attorney Andrea Cartwright ("Cartwright"). On May 31, 2013, K. Jin Lim, the Chapter 7 trustee ("Trustee"), filed a two count complaint objecting to the Debtor's discharge. Count I of the complaint objects to discharge under § 727(a)(2)(A) of the Bankruptcy Code based on allegations that the Debtor transferred property within one year before filing his bankruptcy petition with intent to hinder, delay or defraud a creditor. Count II of the complaint objects to discharge under § 727(a)(4)(A) of the Bankruptcy Code based on allegations that the Debtor made false oaths regarding those transfers and regarding various other assets, and that he did so knowingly and fraudulently.

The Trustee and the Debtor entered into four separate stipulations extending the time for the Debtor to answer the complaint, the last of which extended the date to answer the complaint until October 15, 2013. When the complaint was not answered by that date, the Clerk of the Court entered the Debtor's default on October 16, 2013. Just before the final deadline to answer the complaint, the United States Trustee ("UST") substituted in for the Trustee as plaintiff. After the default was entered, the UST moved for entry of a default judgment. The Court granted the motion on October 24, 2013. The Debtor's discharge was denied.

Several months passed by. On February 7, 2014, the Debtor, now represented by a new attorney, filed a motion to vacate the default judgment. The UST opposed the motion. After two lengthy hearings, the Court granted the motion and vacated the default judgment on April 22, 2014. The Court then set a deadline for the Debtor to answer the complaint and created a schedule for the adversary proceeding.

Eventually, the Debtor's new attorney moved to withdraw from representation of the Debtor. The Debtor did not oppose the motion. On December 17, 2014, the Court granted the motion and permitted the Debtor's new attorney to withdraw. Since that date, the Debtor defended this adversary proceeding pro se.

On February 5, 2015, the Court held a final pretrial conference. During the final pretrial conference, the Court admitted into evidence exhibits 1 through 23 by stipulation of the UST and the Debtor. At the trial, the UST called only one witness: the Debtor. The Debtor called himself and two other witnesses: Cartwright and Robert Peurach, the attorney for the Trustee.

**Facts**

The Court finds the following facts based on the testimony and exhibits admitted at trial.

The Debtor is an individual in his late sixties. He has been married for 32 years to his wife, Tracy, although they do not live together. Tracy lives in Florida. The Debtor lives in Michigan.

The Debtor made his living in the scrap metal business, primarily handling industrial accounts. For many years, the Debtor was the sole owner of Schwartz Iron & Metal, Inc. ("SIMCO"). SIMCO operated at a facility owned by Studebaker Hawk Corporation, another entity owned by the Debtor. The facility was located on Mt. Elliott in Detroit, Michigan ("Studebaker Hawk Facility").

In 2005, SIMCO got into financial difficulties and eventually was forced to wind down its business. For the next couple of years, the Debtor transacted some scrap business through another entity that he owned, Detroit Recycling. In 2007, the Debtor formed a third entity, Schwartz Iron & Metal Company, LLC ("Schwartz LLC"), to continue some scrap business at the Studebaker Hawk Facility. Because the Debtor had been in the scrap business for so long and had so many business

relationships in that industry, it was not important to his customers precisely which entity they did business with, so long as they knew they were doing business with the Debtor.

Unfortunately, Schwartz LLC's business began to deteriorate in 2008 and continued to do so for the next couple of years. During this same time frame, the Debtor also had to refinance the Studebaker Hawk Facility. The Debtor did so with Lachine Financial on what the Debtor believes were very onerous terms.

In 2010, the Debtor formed another entity, Thibault & Co., LLC ("Thibault"), for the purpose of purchasing a 1.1 acre vacant parcel adjacent to the Studebaker Hawk Facility. This parcel had previously been a power plant for Chrysler that had since been demolished. Thibault purchased it for $2,000.00. As the business of Schwartz LLC continued to decline, the Debtor wound up having to give a deed in lieu of foreclosure to Lachine Financial for the Studebaker Hawk Facility. The Debtor then moved the remaining scrap business of Schwartz LLC to the adjacent parcel that was now owned by Thibault.

Although Schwartz LLC continued to transact some scrap business, the Debtor still had creditor problems. During the time that it had operated, SIMCO had a $500,000.00 line of credit with Fifth Third Bank that was personally guaranteed by the Debtor. Although the precise date is not clear from the record, Fifth Third Bank apparently sold its interest in the line of credit and personal guaranty to an entity known as Cadle Rock after SIMCO got into financial difficulty. At some point, although again not clear from the record, either Fifth Third Bank or Cadle Rock filed suit and obtained a judgment against the Debtor on his personal guaranty. Beginning in 2009 and continuing thereafter, Cadle Rock pursued actions to collect the judgment from the Debtor. Meanwhile, the business of Schwartz LLC continued to spiral.

By late 2011, Schwartz LLC could no longer function as an operating entity, although customers still continued to call the Debtor for various jobs. The Debtor's own financial condition likewise continued to deteriorate. The Debtor's personal residence in Franklin, Michigan was now in foreclosure. The Debtor's primary bank account during this time was at Comerica Bank. The records from that bank account (exhibit 7) reveal little activity during 2012, although the Debtor did continue to receive some jobs and did continue to generate some revenue from those jobs and through commission arrangements. Since Schwartz LLC no longer had a bank account, he used a bank account for Thibault to make deposits and disbursements for these jobs (exhibit 12).

Several significant events occurred in 2012 regarding the Debtor's financial condition. First, sometime in 2012, Cadle Rock sold its interest in the judgment on the Debtor's personal guaranty to an entity known as BBB Holding, LLC ("BBB"). BBB was owned by three individuals that the Debtor knew, one of whom was also a principal in Lachine Financial, the entity that had refinanced the Studebaker Hawk Facility and that had eventually taken a deed in lieu of foreclosure of that property. According to the Debtor, this individual had a personal vendetta against him. Although the precise amount owing on the judgment at the time that BBB acquired it is uncertain, the Debtor's schedule F (exhibit 1) in his bankruptcy case lists a debt to BBB in the amount of $722,828.82 and states that BBB is the holder of a judgment for that debt and that the debt is not in dispute. Once it acquired the judgment, BBB aggressively pursued collection actions against the Debtor, including garnishments of his bank account.

Another significant event in 2012 regarding the Debtor's financial condition pertained to the 1.1 acre parcel owned by Thibault that was adjacent to the Studebaker Hawk Facility. In summer, 2012, an old acquaintance of the Debtor, Hal Rosin, contacted the Debtor and expressed an interest

in acquiring the property. To accomplish this, Rosin's company, Streamco, LLC, purchased the Debtor's sole membership interest in Thibault on August 30, 2012 for $35,607.80 (exhibit 11). The check was made payable to the Debtor.

Because BBB had been garnishing the Debtor's personal bank account, the Debtor did not want to deposit the Thibault sale proceeds in his own bank account. He wanted to hide them from BBB and use them to pay other bills and living expenses. To keep the sale proceeds from BBB, the Debtor did not deposit them into his own personal bank account, but instead deposited them in a separate bank account that he had opened for yet another entity that he had previously formed, Cigars & Cognac, LLC ("C&C").

The Debtor had formed C&C on September 21, 2010 as a single member limited liability company, with the Debtor as its sole member (exhibit 5). The Debtor formed C&C because he liked the name and hoped some day to do business through it. But he had not transacted any business through C&C until September, 2012, and it was basically dormant until that time. C&C then became active because of BBB's collection actions against the Debtor. On September 7, 2012, the Debtor deposited the $35,607.80 of proceeds that he received from selling his membership interest in Thibault into C&C's bank account at Comerica Bank. The records of that account (exhibit 6) show that virtually all of the Thibault sale proceeds were disbursed out of that account during the month of September, 2012. The Debtor drew checks on that account in September, 2012 to pay living expenses, attorney fees, business expenses for jobs that Schwartz LLC was still winding

-6-

13-04622-pjs    Doc 78    Filed 03/03/15    Entered 03/04/15 08:11:12    Page 6 of 20

down, and various other creditors. The Debtor also drew checks to his wife, Tracy, and other checks simply made out to cash.[1]

Just before depositing the Thibault sale proceeds in the C&C account, the Debtor made a major change to the ownership of C&C. Specifically, although the Debtor had formed C&C and had been its only member since its formation, the Debtor transferred a 98% interest in C&C to a business acquaintance, Norman Kiminaia, in summer, 2012. Kiminaia did not pay anything for the 98% interest. However, despite the fact that Kiminaia now owned a 98% interest in C&C, he expressly gave the Debtor permission to use the C&C bank account so that the Debtor could hide the Thibault sale proceeds from BBB and use the C&C bank account to pay the Debtor's living expenses and other bills. According to the Debtor, Kiminaia did so because he knew that the Thibault sale proceeds were the Debtor's property, and Kiminaia wanted to help protect the Debtor from BBB.

On December 10, 2012, the Debtor filed his schedules of assets and liabilities and statement of financial affairs, along with his petition. The Debtor's schedules list few assets. Schedule A lists no interests in any real property. Schedule B lists a total of $26,590.36 of personal property consisting primarily of two vehicles, a 1990 Buick Reatta, and a 2012 Ford Fusion, which together represent $20,837.00 of the Debtor's total personal property. The Debtor's interest in C&C is not listed anywhere on schedule B. The Debtor's schedules list debts totaling $1,412,016.17, of which

---

[1] In addition to the Thibault sale proceeds that he deposited in C&C's account, the Debtor continued after that time to make other deposits into the C&C account. The records for that account show that in October, the Debtor deposited $7,904.00, in November $9,057.00, in December, $5,440.80, and continued to make deposits into the account even after he filed his Chapter 7 bankruptcy case. Neither the Thibault sale proceeds nor the other deposits in the C&C bank account came from any business transacted by C&C. All of them came from the Debtor.

-7-

BBB holds $722,828.82. On schedule I the Debtor states that he has been unemployed for 11 months and receives no income other than social security benefits of $1,871.00 per month.

In answer to question nos. 1 and 2 on his statement of financial affairs, the Debtor states that during 2012 he had only $1.00 in income from employment, operation of business, or any other source. In answer to question no. 3 on his statement of financial affairs, the Debtor states that he made no payments to creditors during the 90 days before bankruptcy. In answer to question no. 10 regarding transfers of property in the two years before bankruptcy, the Debtor lists the transfer of his interest in Thibault to Streamco, LLC on September 7, 2012, but does not list the transfer of 98% of his interest in C&C to Kiminaia in summer, 2012. Nor does he list the deposit of the Thibault sale proceeds into the C&C bank account, or any transfers of funds out of that account. In answer to question no. 18, which requires the Debtor to list his interests in all business entities during the six years before his bankruptcy case, the Debtor lists his interests in various entities, including SIMCO, Schwartz, LLC and Thibault, but does not list any interest in C&C. Neither the Debtor's schedules of assets and liabilities nor his statement of financial affairs mention either C&C or C&C's bank account that the Debtor used to deposit and pay out the Thibault sale proceeds in September, 2012.

On January 14, 2013, the Debtor amended his schedules. In answer to question no. 13 on amended schedule B (exhibit 2), the Debtor now lists a 2% interest in C&C. The Debtor made no other amendments to his schedules or statement of financial affairs.

On January 17, 2013, the Trustee conducted the § 341 meeting. The Debtor testified that his schedules and statement of financial affairs were accurate. The Trustee asked a number of questions about the largest asset listed in the Debtor's schedules, the Ford Fusion. The Debtor testified

-8-

13-04622-pjs    Doc 78    Filed 03/03/15    Entered 03/04/15 08:11:12    Page 8 of 20

(exhibit 3, page 10, lines 13-19) that he purchased the Ford Fusion in February, 2012 with funds that were given to him by his wife. He further testified (exhibit 3, page 11, lines 1-6) that the title was initially issued to him, but that he had it "retitled" in October, 2012 to reflect that it was owned jointly by him and his wife because his wife is "the one that paid for it."

On March 26, 2013, the Trustee conducted a Fed. R. Bankr. P. 2004 examination of the Debtor (exhibit 4). The Debtor again testified that his schedules and statement of financial affairs were accurate (exhibit 4, page 8, lines 14-17). As for his marital situation, the Debtor explained that even though he and his wife have been married for many years, she resides at a condominium in Florida and only comes to Michigan from time to time. She spends significant time boating and arranging for boat trips. As for finances, the Debtor testified (exhibit 4, page 20, lines 3-13) that they each handle their own finances and bills.

At the Rule 2004 examination, the Trustee again asked about the Ford Fusion. The Debtor testified (exhibit 4, page 23, lines 17-18) that his wife "loaned me the money to buy the car," and that the funds were wired to him by his wife (exhibit 4, page 25, lines 6-17). The Debtor later reiterated that he had "borrowed" these funds from his wife (exhibit 4, page 31, lines 10-13). The Debtor also acknowledged that even though he was originally the only individual shown on the title, the title was reissued on October 24, 2012, a few weeks before he filed his bankruptcy case, so that his wife could be put on the title along with him (exhibit 4, page 33). The reason for this, according to the Debtor, was that his wife had loaned him the money to purchase it and he had not paid her back. When the Trustee asked the Debtor if the Ford Fusion was still titled to the Debtor and his wife jointly, he said that it was. When the Trustee confronted the Debtor with records from the Michigan Vehicle Registration office that showed that the title was subsequently transferred back

to the Debtor individually on December 17, 2012, the Debtor testified that these records were "incorrect" (exhibit 4, page 34, lines 3-9), denied that the vehicle had been retitled to him after the bankruptcy case was filed, and insisted that it was still jointly titled to him and his wife (exhibit 4, page 34, lines 15-20).

The Trustee also inquired at the Rule 2004 examination about C&C. The Debtor explained that C&C did not transact any business until 2012, and that it was formed just for the purpose of reserving the name (exhibit 4, page 79, lines 17-21). Here, the Debtor's testimony was somewhat ambiguous. The Debtor testified at one point that C&C did start doing some business in 2012 regarding importing and exporting, but stated unequivocally that *he* had not transacted any scrap business through C&C (exhibit 4, page 82, lines 10-16). The Debtor explained that any business that is now conducted through C&C is done by Kiminaia. The Debtor admitted that Kiminaia had purchased a 98% interest in C&C from the Debtor for $1.00, but the Debtor could not remember exactly when that took place (exhibit 4, page 83, lines 21-25, and page 84, lines 1-3). The best the Debtor could recall is that he sold his 98% interest to Kiminaia during summer, 2012 (exhibit 4, page 84, line 3). Notwithstanding the Debtor's vague testimony about C&C's business, the Debtor unequivocally stated that he deposited the Thibault sale proceeds into C&C's bank account, while Kiminaia was the 98% owner of C&C (exhibit 4, page 89, lines 1-15). The Trustee then asked the Debtor a number of questions about the disbursements out of the C&C bank account from the Thibault sale proceeds. When the Trustee asked about the disbursements made out of the account to the Debtor's wife, Tracy, and produced copies of checks that the Debtor made out to Tracy, the Debtor explained that those checks were to repay Tracy for loans that she had made to him over time

(exhibit 4, pages 118-119). The Debtor acknowledged that there were no promissory notes or other documentation for these loans.

## Conclusions of Law

The burden of proof is on the UST, as the party objecting to discharge, by a preponderance of the evidence. See Taunt v. Patrick (In re Patrick), 290 B.R. 306, 310 (Bankr. E.D. Mich.2003) (citing Barclays/American Business Credit, Inc. v. Adams (In re Adams), 31 F.3d 389, 393-94 (6th Cir.1994)). "[T]he rule of this circuit is that the right to a discharge in bankruptcy should be liberally construed." Newman v. Burnham (In re Newman), 126 F.2d 336, 337 (6th Cir. 1942) (citations omitted); see also Keeney v. Smith (In re Keeney), 227 F.3d 679, 683 (6th Cir. 2000) (citation omitted).

### Section 727(a)(2)(A)

Count I of the UST's complaint requests the Court deny the Debtor a discharge under § 727(a)(2)(A) of the Bankruptcy Code.

Section 727(a)(2)(A) provides as follows:

> The court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>
> (A) property of the debtor, within one year before the date of the filing of the petition[.]

Section 727(a)(2)(A) "encompasses two elements: 1) a disposition of property, such as concealment, and 2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act disposing of the property." In re Keeney, 227 F.3d at 683 (internal quotation marks and citation omitted).

-11-

The Complaint in this adversary proceeding alleges that the Debtor made many transfers in the year before he filed bankruptcy with intent to hinder, delay or defraud a creditor. However, the UST's evidence at trial focused on four specific transfers: (1) the transfer of 98% of the Debtor's interest in C&C to Kiminaia; (2) the transfer of the Debtor's membership interest in Thibault to Streamco, LLC; (3) the transfer of the Thibault sale proceeds by the Debtor out of the C&C bank account; and (4) the transfer of the Ford Fusion to the Debtor and his wife. The Debtor does not dispute that he made these transfers, and the evidence establishes that he made all of them within the year before he filed bankruptcy. But in order to prevail on count I of the complaint, the UST must also prove by a preponderance of the evidence that a transfer was made by the Debtor with a subjective intent to hinder, delay or defraud a creditor. The Debtor vigorously disputes that he made these transfers to hinder, delay or defraud a creditor.

The evidence shows that the Debtor transferred the 98% interest in C&C to Kiminaia in summer, 2012 for $1.00. At the time of the transfer, the evidence shows that C&C was conducting no business. If viewed in isolation, one could argue that the transfer of a 98% interest in a dormant entity may not have been undertaken to hinder, delay or defraud a creditor. But the Debtor's own uncontroverted testimony does not permit the Court to view this transfer in isolation. The Debtor's true purpose in making this transfer to Kiminaia is easy to see when the Court considers the context of this transfer, especially the deposit of the Thibault sale proceeds in the C&C bank account.

The Debtor concedes that he transferred his interest in C&C to Kiminaia after Kiminaia said he wanted to help the Debtor by protecting him from BBB's collection efforts. The Debtor freely admits that he then put the Thibault sale proceeds into the C&C bank account to hide them from BBB, to keep them out of BBB's reach, and to prevent BBB from garnishing them so that he could

use those proceeds to pay his living expenses, other creditors, and his wife. And that's just what he did with the proceeds. He paid living expenses, his creditors, and his wife.

The Debtor rationalizes his conduct by explaining that BBB had a personal vendetta against him and that he just wanted to use the proceeds to pay his living expenses and other obligations. But those facts, even if true, are irrelevant for purposes of § 727(a)(2)(A). All that § 727(a)(2)(A) requires is a showing that a transfer was made within one year before bankruptcy with a subjective intent to hinder, delay or defraud a creditor. There is no doubt that BBB was a creditor of the Debtor at the time that the Debtor made the transfer of the 98% interest in C&C to Kiminaia and at the time that he deposited the Thibault sale proceeds in the C&C bank account. And there is no doubt that in doing so, the Debtor had a subjective intent to hinder and delay BBB. That was the Debtor's expressly stated purpose. That is all that § 727(a)(2)(A) requires.

The Court finds that the transfer of the 98% interest in C&C to Kiminaia, and the transfer of the Thibault sale proceeds into the C&C bank account were made by the Debtor with a specific and deliberate intention to hinder and delay his largest creditor, BBB. Therefore, the UST has proved by a preponderance of the evidence, from the Debtor's own admissions, that all of the elements of § 727(a)(2)(A) are present based on these two transfers alone, without regard to the UST's allegations concerning the other two transfers – the sale of the Thibault membership interest and the transfer of the Ford Fusion. Accordingly, the Court denies the Debtor's discharge under § 727(a)(2)(A), and need not reach or discuss the other transfers alleged by the UST.

## Section 727(a)(4)(A)

Count II of the complaint requests the Court deny the Debtor a discharge under § 727(a)(4)(A) of the Bankruptcy Code.

-13-

> In order to deny a debtor discharge under this section, a plaintiff must prove by a preponderance of the evidence that: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case. Whether a debtor has made a false oath under section 727(a)(4)(A) is a question of fact.

In re Keeney, 227 F.3d at 685 (internal quotation marks and citation omitted).

> Complete financial disclosure is a prerequisite to the privilege of discharge. . . . [I]ntent to defraud involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression. A reckless disregard as to whether a representation is true will also satisfy the intent requirement. [C]ourts may deduce fraudulent intent from all the facts and circumstances of a case. However, a debtor is entitled to discharge if false information is the result of mistake or inadvertence. The subject of a false oath is material if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.

Id. at 685-86 (internal quotation marks and citations omitted).

> Under this section, an omission alone from the debtor's statement of affairs or schedules is grounds for denying a discharge. If a debtor fails to fully provide information that is required, the debtor will be denied a discharge under § 727(a)(4). Of course, a debtor may, at times, make a misstatement and prove that the misstatement caused minimal harm to the estate. However, the determination of relevance and importance of the question is not for the debtor to make.

Stevenson v. Cutler (In re Cutler), 291 B.R. 718, 725-26 (Bankr. E.D. Mich. 2003) (J. Rhodes) (internal quotation marks and citations omitted). "[A] fraudulent statement must be made with a knowing intent to defraud creditors. . . . The plaintiff must demonstrate actual, not constructive, fraud." Id. at 726 (internal quotation marks and citations omitted). "However, since defendants will rarely admit their fraudulent intent, actual intent may be inferred from circumstantial evidence. A series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive." Id. (quotation marks and citations omitted).

-14-

The complaint in this adversary proceeding alleges that the Debtor made many false statements in his schedules and statement of financial affairs regarding his assets and the transfers that he made prior to filing bankruptcy. The evidence proves this allegation. Among the Debtor's false statements in his schedules and statement of financial affairs are the following. The Debtor's original schedule B fails to list his interest in C&C. The Debtor's statement of financial affairs fails to list his transfer of his 98% interest in C&C to Kiminaia, and fails to list his transfer of the Thibault sale proceeds into C&C's bank account. The Debtor's statement of financial affairs fails to list the transfers to the Debtor's creditors that he made with the Thibault sale proceeds out of the C&C bank account. The Debtor's statement of financial affairs fails to list the $35,607.80 of income that he received from the Thibault sale proceeds. The Debtor's statement of financial affairs fails to list commissions and other revenues that the Debtor received in 2012 and then deposited into C&C's bank account. The Debtor's schedule I falsely states that the Debtor's only income at the time he filed his bankruptcy petition was from social security payments. The Debtor's statement of financial affairs fails to list the transfer of the Ford Fusion to the Debtor and his wife in October, 2012.

Although not part of the complaint, the Debtor admitted at trial that he testified falsely at both his § 341 hearing and his Rule 2004 examination that he had borrowed money from his wife Tracy from time to time, including specifically the funds that he used to purchase the Ford Fusion. Contrary to his prior testimony, the Debtor testified at trial that his wife did not make any loans to him, either for the Ford Fusion, or otherwise. At trial, the Debtor explained that the proceeds that he used to purchase the Ford Fusion came from a jointly issued insurance check that paid a claim for a vehicle that he had previously owned. Tracy did not wire to him any funds to purchase the

-15-

Ford Fusion as he testified during his Rule 2004 examination. And the disbursements out of the C&C account that the Debtor made to Tracy from the Thibault sale proceeds were not to repay loans, but were instead to provide support to his wife, according to the Debtor's testimony at trial.

The Debtor readily acknowledged at trial that his schedules and statement of financial affairs contain a number of false statements, but he attributes them all to mistake or inadvertence, either by him or by his attorney, Cartwright. He also acknowledged his false testimony both at the § 341 hearing and the Rule 2004 examination, but he attributes this false testimony to stress and panic that he was suffering from when he testified. The Debtor also testified that he suffers from health issues, which in the past have affected his memory. In addition, the Debtor testified that many of the omissions were the result of the theft of personal papers from his home on July 5, 2011, in a break in he is convinced was orchestrated by BBB. In sum, the Debtor now concedes that he made false statements under oath, and does not dispute that he knew that they were false when he made them, but he vehemently denies that he made them with a fraudulent intent.

The Court understands that many times mistakes are made in a debtor's schedules and statement of financial affairs. The Court also realizes that individuals can and do experience stress and panic, particularly in circumstances like the Debtor's. But the evidence in this case establishes that there were many false statements in the schedules and statement of financial affairs. Assets (e.g., C&C) were not disclosed. Transfers (e.g., C&C; the Thibault sale proceeds; and the Ford Fusion) were not disclosed. Income (e.g., the Thibault sale proceeds; the Debtor's commissions and revenues from scrap transactions) was not disclosed. And payments to creditors (e.g., payments to attorneys) were not disclosed.

The most significant of these false statements is the complete omission from the Debtor's schedules and statement of financial affairs of the use by the Debtor of the C&C bank account to pay out the Thibault sale proceeds, plus other income he earned as customers continued to call him for scrap metal jobs. The original schedules and statement of financial affairs do not show that the Debtor had any interest in C&C, that the Debtor had made a transfer of any interest in C&C, or that the Debtor had deposited the Thibault sale proceeds in a bank account under the name of C&C, despite the Debtor's admission that this was all done solely and purposely to keep the proceeds out of the reach of the Debtor's largest creditor, BBB. All of these events occurred very close in proximity to the time when the Debtor filed the bankruptcy case. According to the Debtor, all of these events also took place at or about the time he first consulted bankruptcy counsel, approximately three months before he filed his Chapter 7 bankruptcy case.

The Debtor testified on many subjects in a manner that the Court finds credible. However, the Court does not find credible the Debtor's testimony that the omission from his schedules and statement of financial affairs of the transfer of his interest in C&C, the deposit of the Thibault sale proceeds into the C&C bank account, and the payments to his creditors and others out of that account, were the result of mistake or inadvertence. The Thibault sale proceeds were by far the Debtor's largest asset. Those sale proceeds, plus the income washed through C&C from other odd jobs, were the sole means for him to pay his living expenses and his creditors. The Debtor's only other source of income was from social security, which he had just qualified for and began receiving in November, 2012. Nor does the Court find credible the Debtor's excuse that he could not piece together all of the information required to complete his schedules and statement of financial affairs because his personal papers were stolen. The break in occurred in July, 2011. C&C did not become

-17-

active until over a year later, in September, 2012. The deposits into and payments out of C&C's bank account were recent transactions that would not have been reflected in the stolen papers. Further, the sheer volume of incorrect statements in this case, and the Debtor's admitted false testimony both in his § 341 meeting and in his Rule 2004 examination, tend to show that the Debtor's failure to disclose the transfer of his interest in C&C and the use of C&C's bank account is more likely the product of a fraudulent intent rather than mistake or inadvertence.

Taken together, the facts and circumstances of this case inexorably lead the Court to infer that the Debtor made false statements with fraudulent intent. The best that can be said for the Debtor is that he filled out his schedules and statement of financial affairs with a reckless disregard to the truth of the statements contained in them. Further, the Court rejects the Debtor's contention that the false statements in the Debtor's schedules and statement of financial affairs was Cartwright's fault. The record does not support a finding that it was Cartwright, and not the Debtor, who was at fault.

The Court finds that the Debtor knew that the statements that he made in his schedules and statement of financial affairs were false when he made them, and that he did so either with an intention to deceive or, at a minimum, with a reckless disregard of the truth, and that these false statements related materially to his bankruptcy case. The UST has proven, by a preponderance of the evidence, all of the elements of § 727(a)(4)(A). Therefore, the Court denies the Debtor's discharge.

**Conclusion**

In many respects, the Debtor is a very sympathetic figure. He is not a young man. He suffers from health problems. He lost his home to foreclosure and his business failed. He is left with substantial personal liability. To that extent, he is an unfortunate debtor in need of a discharge.

-18-

But in order to obtain a discharge, it is not enough that one is in need. One must also deal honestly with one's creditors, even those creditors who one believes are being unreasonable, and with the bankruptcy court. In the months before he filed bankruptcy, the Debtor now freely admits that he took his largest asset – the Thibault sale proceeds – and instead of putting them in his own bank account, put them in a bank account belonging to C&C, an otherwise dormant entity that he had just recently transferred to a third party for no consideration. The Debtor's express purpose was to hide this money from his largest creditor, one who had been aggressive in pursuing collection actions against him. The Debtor's conduct was improper. The Debtor then compounded his situation by filing false schedules and statement of financial affairs, and by testifying falsely at his § 341 hearing and Rule 2004 examination.

To his credit, the Debtor did testify credibly on many subjects during the trial. He admitted to making many mistakes and seemed genuinely sorry that he testified falsely as his § 341 hearing and Rule 2004 examination. And even though he appeared pro se, he vigorously argued his case to the Court. But even now, the Debtor still does not seem to fully understand that obtaining a Chapter 7 discharge is not a right. No matter how unfortunate the Debtor's circumstances are, and despite the Court's predisposition in favor of seeing an individual get a fresh start, the Court cannot grant the Debtor a discharge in this case. The UST has proved all of the elements of § 727(a)(2)(A) and § 727(a)(4)(A), which warrant a denial of the Debtor's discharge. The Court will therefore enter an order consistent with this opinion.

.

**Signed on March 03, 2015**

               **/s/ Phillip J. Shefferly**
                **Phillip J. Shefferly**

-19-

United States Bankruptcy Judge